(2 App. Div. 536.)

PEOPLE ex rel. STRAUSS v. ROOSEVELT et al., Board of Police.

(Supreme Court, Appellate Division, First Department. March 20, 1896.)

1. POLICE OFFICER — FALSE CHARGES AGAINST SUBORDINATE — SUFFICIENCY OF EVIDENCE.

On trial of a police captain, it appeared that defendant was ordered to send a detail to escort a parade while it passed through his precinct, and defendant's sergeant, the officer sent in charge of the detail, and three of its number testified that defendant ordered them to meet the parade at a place outside his precinct, and the sergeant testified that defendant afterwards ordered him to change the entry on the station record by inserting a place within the precinct, and that defendant stated, at the time, that the original entry might give them trouble. It was shown that defendant, on the next day, preferred charges against the detail officer for going beyond the precinct, and that, after trial, such officer

was acquitted. Defendant admitted the falsity of such charges, but claimed that they were based on a statement by the sergeant that he had ordered the detail to go to a place within the precinct, which was denied by the sergeant, and was inconsistent with the haste shown in preferring the charges. Defendant's testimony was inconsistent, and conflicted with his testimony on trial of the detail officer. *Held*, that the evidence sustained a conviction for falsely making charges against the detail officer and altering the station-house records to cover up the mistake in the order.

2. SAME—EVIDENCE—PREVIOUS OFFICIAL RECORD.

On trial of a police captain for falsely making charges against a subordinate officer, it was not error for the police commissioners to consider defendant's prior official record merely in fixing the punishment.

Certiorari by William Strauss to review proceedings by Theodore Roosevelt and others, composing the board of police of the police department of the city of New York, resulting in Strauss' dismissal from the position of captain of police. Affirmed.

The relator, a captain in the police department of the city of New York, was dismissed from the service on November 22, 1895. The charges upon which he was found guilty contained the following specifications:

"First. The said Capt. Strauss did, on or about the 2d day of September, 1895, authorize and permit the erasure by Acting Sergeant Hammond, of the same precinct, of an entry in the station-house blotter of said precinct, made as of the date and hour of 6:25 p. m., September 2, 1895, and the substitution by said Hammond of another entry in place thereof. `

"Second. On the 3d day of September, 1895, the said Capt. William Strauss did falsely, and with intent to deceive, report in writing to the chief of police that, at 6:30 p. m., on the 2d day of September, 1895, Roundsman John Buckley and six policemen from the reserve were sent to Seventy-Ninth street and First avenue, with instructions to enforce the ordinance relative to fireworks, and preserve the peace, and that the said Roundsman Buckley, in mistake, went as far as Eighty-Sixth street; the fact being otherwise, as the said Capt. William Strauss then and there well knew.

"Third. The said Capt. William Strauss did, on or about the 4th day of September, 1895, with intent to deceive, falsely charge the said Roundsman John Buckley with 'neglect of duty,' in this, to wit: Roundman John Buckley was directed by Acting Sergeant Samuel Hammond to go to First avenue and Seventy-Ninth street with six patrolmen from the reserves to preserve the peace and prevent fireworks being set off by the Cherokee Club, who had a parade, at 8 p. m., September 2, 1895, and, instead of going to the place directed, he went to the foot of East Eighty-Sixth street, and, when he was informed that the Twenty-Seventh precinct police had charge, and that they would escort the above-named club through their precinct, the said roundsman returned with his men to the station house."

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, WILLIAMS, and PATTERSON, JJ.

Louis J. Grant, for relator.

Theodore Connoly, for respondents.

BARRETT, J. No error of law in the proceedings under review is urged upon us by the counsel for the relator. He claims, simply, that the respondents reached an erroneous conclusion in view of the facts proved, and asks us to set aside the decision as contrary to the weight of evidence. Code Civ. Proc. § 2140, subd. 5.

On September 2, 1895, an organization called the "Cherokee Club" had a parade. The members went from the club house at Seventy-Ninth street and First avenue to Eighty-Sixth street and East

river, where they embarked.   They were expected to land at the latter spot on the evening of this day, and an order was sent to the relator from the central office to have men present along the route of the parade, so far as it lay in his precinct (the Twenty-Fifth)· to prevent the discharge of fireworks.   A roundsman named Buckley and six men were sent upon this duty.   Instead of going to Seventy-Ninth street and First avenue, which was in the Twenty-Fifth precinct, they went first to Eighty-Sixth street and East river, which is in the Twenty-Seventh.   The relator subsequently charged Buckley with neglect of duty in going to the wrong place.   The trial resulted in his acquittal.   The respondents claim that the charge against Buckley was false; that the relator directed him to go to Eighty-Sixth street, and subsequently attempted to cover up his mistake by procuring an erasure of the entry in the station-house blotter which recorded the misdirection.

The principal witnesses for the prosecution were Hammond, the acting sergeant, and Buckley, the roundsman.   The testimony of these two men is in entire accord.   They say that, about 6 p. m., on September 2d, the day of the parade, the relator told Buckley that the Cherokee Club would land at Eighty-Sixth street and First avenue about 8 p. m., and that he wanted Buckley and six men to go to this place, and escort the procession; that Hammond passed the men along upon this order, without himself intervening; that, after Buckley and his men started out, the former returned to make sure that there had been no mistake in sending him to a place outside of the precinct; and that Hammond told him to obey the relator's orders.   Hammond further says that he made the entry of a direction to go to Eighty-Sixth street in the station-house blotter about 6:30 p. m., and that, between 11:30 and 12 the same evening, the relator told him he had better change it to Seventy-Ninth street, since the entry as it was might get them into trouble, and Hammond accordingly made the change.   Buckley further states that, when he got back with his men to the station house, he had a talk with the relator, who declared that he had sent the witness to Seventy-Ninth street, which the latter denied.   Also, that, the next morning, the relator called him into his office, and told him that he was getting up a report to send to Chief Conlin; that he showed him part of it, which contained the statement that witness had been sent to Seventy-Ninth street; and that witness told the relator that this was not true, and that, if he sent this, he would send in a false report.

The relator, in his own defense, denied these charges, and his counsel vehemently assails Hammond's credibility.   That the latter has perjured himself there can be no doubt.   On the trial of Buckley he testified in the relator's behalf, and swore that he himself ordered the men to go to Seventy-Ninth street, and made the entry accordingly; that he did not make the erasure under anybody's direction, but because of his own mistake; and that the correction was made before the men left the station house.   On the present trial the witness, after some evasion and attempt to reconcile his different statements, admitted the falsity of his former testimony, and said

that it was given to shield the relator, and at his instigation. An-other circumstance is also alleged against him. It is undisputed that the relator, at the time the order to Buckley was given, made out a card on which were written the names of the men who were to go with Buckley and the location to which they were sent. From this card Hammond made the entry in the blotter. At the trial a torn fragment of the card was produced,. which contained the names of the men, but not the location. Hammond said he found this torn fragment in an ash barrel some days afterward, and gave it to Com-missioner Roosevelt. The relator points out, as suspicious, the cir-cumstances that the card, which was last in Hammond's possession, should lack the very portion which, he says, would have vindicated him. He also proves facts tending to discredit Hammond's story of how he found the card. The respondents' argument, however, leaves the effect of this circumstance in equipoise. Why, they say, should Hammond have produced the card at all if it made against him? They argue, also, that the card in all probability contained the very Eighty-Sixth street address which the blotter contained at first, since the entry in the blotter was made from the card.

We now come to the relator's own testimony. He swears that he told Hammond that the men must go to Seventy-Ninth street and First avenue, and also wrote the direction on a card. The other half of the card, he says, contained this direction. He thus declares that it was Hammond who gave the order to the men, and in this Ham-mond's former testimony supports him. He also swears that later this same night, Hammond told him that the men had come back from Eighty-Sixth street; that he asked what they were doing up there; and that Hammond said he did not know, for he told them to go to Seventy-Ninth street. In this he is corroborated by Clements, a friend of the relator of 10 years' standing, who was in the rela-tor's office, and swears that he overheard what was said. It is, however, peculiar and somewhat significant that the relator, in tes-tifying as to the admission made by Hammond that he sent the men up to Eighty-Sixth street, at first inadvertently substituted Seventy-Ninth street for Eighty-Sixth street. In other words, he made the same mistake at the trial which the witnesses against him say that he made on September 2d. The discrepancies and difficulties in the relator's testimony are many and serious. His testimony varies from that given on the Buckley trial nearly as much as that of Hammond himself. On the Buckley trial he swore, first, that he had no conversation with Buckley whatever on the night of September 2d, and then that he had one, but merely about certain pay rolls. On his own trial he had another access of mem-ory, and recollected the whole of the conversations, admitting Buckley's strenuous assertion, made in the course of these conver-sations, of his present position. On the Buckley trial he swore that, on the morning of the 3d, he did not mention Chief Conlin's name, though now he fully admits the conversation about the re-port to which Buckley testifies. On the Buckley trial he swore that Buckley, when asked why he went to Eighty-Sixth street, said it was because the sergeant (Hammond) so ordered him. On his

own trial, he admits that Buckley said it was because the relator himself so ordered him.    Upon his own trial, he also denied in toto Hammond's testimony as to the erasure in the blotter, and said he knew nothing about it until the Buckley trial.    But he testified that, after his talk with Buckley in the evening of September 2d, he examined the blotter, to make sure that the direction given to Buckley had been Seventy-Ninth street, and found that the entry was correct, viz. Seventy-Ninth street and First avenue.    This placed him in a dilemma, for, if the erasure had been made before he looked at the book, he should have seen it, and known of it at the Buckley trial;  and, if it was made afterward, some one had committed the absurdity of erasing the entry, and then replacing it.    Under pronounced prompting from his counsel, he chose to say that he did not observe the erasure when he examined the blotter upon the evening of September 2d, and intimated that it might still have been there, as he did not scrutinize the book carefully.

It is also very important that three of the men who went with Buckley, and the only ones who were put on the stand, all swear that the orders they received that night were to go to Eighty-Sixth street.    These witnesses do not seem to have been present when the relator gave his orders.    They swear that the orders in question were read over the desk by the sergeant in charge, viz. Hammond.    This is the strongest corroboration of Hammond's present testimony, and points quite persuasively to the fact that the original entry in the book was Eighty-Sixth street and First avenue. Hammond had no possible motive for giving a wrong direction to the men, and that he should have made a mistake in reading from the book is most improbable.    Unless, therefore, the entry was changed between 6 o'clock and 9, the relator was not accurate when he swore that it read differently at the latter hour.    Even if Hammond's testimony on the Buckley trial be taken as true, it does not aid the relator.    He then said that he made a mistaken entry, but corrected it before the men left the station house.    Assume that he did this just as they were leaving, still the matter was then in his mind, and it is inconceivable that he should have purposely sent the men on a wrong errand.

The relator's counsel makes the claim that there is as little likelihood that the relator made such a mistake as that Hammond did, because he also read from a book, viz. the telegraph blotter.    This is a book in which is kept a record of dispatches received from headquarters.    As to this affair, it contained a notification of the course the Cherokee Club would take, and a direction to the relator to patrol "the routes of parades in your precinct."    Buckley testifies:

"He [the relator] then picked up the blotter, the telegraph blotter, and read the route that was to be taken, from Eighty-Sixth street and East river to First avenue, down First avenue to Seventy-Ninth street, where they were to dismiss.  He read that route to me three times, so as to impress it upon my memory the better."

The difference between the reading of this telegraph blotter and Hammond's reading from the station-house blotter is apparent.    It

is fair to assume that Hammond did not read aloud, by mistake, one address, when another was written. Neither did the relator. He read the locations given in the telegraph blotter, but made the mistake of not limiting Buckley to that part of the course within his precinct. He is simply asking us to assume that he did not make this mistake.

Finally, there is, in the record, the admission that the charges against Buckley were false. The relator's counsel distinctly admits this to be his theory. No one but the relator, however, made any charges against Buckley. It is said that the relator, in making the false charge against Buckley, relied upon Hammond's statement that he gave the order to go to Seventy-Ninth street. This reliance upon Hammond was not genuine. The relator undoubtedly knew better. But, even if his good faith in that particular could be granted, we should still have difficulty in reconciling his conduct with a candid desire to do justice. The report to Chief Conlin, containing the charge against Buckley, was sent the next day. The relator admits that the matter was important, and says that he made inquiries of different witnesses in order to ascertain the truth. He did, in fact, inquire, either before or afterwards, of three men who went with Buckley; but each of them then said just what Buckley had said, viz. that they were sent to Eighty-Sixth street. There is certainly something suspicious in the almost indecent haste with which this report, with this serious charge in it, was thus sent off.

The crucial question is whether or not the relator himself gave the erroneous order to Buckley. If he did, it taints the whole of his conduct, and he was rightfully found guilty on all three specifications. As to the last two specifications the proposition is self-evident. As to the first, the erasure, it is scarcely less plain. The station-house blotter was simply an accurate index of the orders given. If, then, the relator gave an order to go to Eighty-Sixth street, the change of the entry to Seventy-Ninth street could only be to shield him. Hammond would have had no interest in changing it, for it would not have been his mistake. The relator must, therefore, stand or fall upon the existence or nonexistence of the fact above stated; and on that point the clear weight of evidence is against him. Putting aside the testimony of Hammond, we still have Buckley's, which was consistent and trustworthy. Whatever the relator and Hammond may have done, Buckley, at least, adhered to the same story throughout; and his testimony is worthy of the fullest credit. The former testimony given by Hammond, also, though none the less discreditable, can still be accounted for. The relator was his supporter, and, while Buckley alone was concerned, interest seemed to dictate that he adhere to the former. But Buckley was acquitted, and then charges against himself on account of the erasure seemed imminent. Self-interest now seemed to lead another way, and to this may also have been joined a suspicion as to whether the relator had the ability to fulfill his promise to get the charges against himself (Hammond) dismissed, if any should be made, or to lighten the punishment. The role of a scape-

goat may well have seemed perilous.    Thus, Hammond's action is not hard to follow or account for, though none the less dishonorable.

We have scrutinized the record with great care to see that no injustice has been done the relator, and are convinced that he had a fair trial, and was properly dismissed.    It is impossible to set forth, in the brief limits of an opinion, all the facts contained in the record; but nothing has been overlooked which bears in the relator's favor, and many circumstances which tell against him have not been adverted to.

No point was taken by the relator upon the argument as to the use made by the respondents of his record.    This was, doubtless, because, as he avers in his petition, his record had been good.    His averment is that only two trivial charges had been made against him during the 23 years that he had been upon the force.    The record, therefore, even if erroneously considered, could only have helped him.    It appears, however, that the final resolution of the board, adjudging that the charges were true, made no mention of the record, and consequently had no bearing upon the question of guilt.    From what appears in the return, it is fair to assume that the record was considered only on the question of punishment.    The case, therefore, is not within the rule laid down in the recent decision in People v. Roosevelt, 37 N. Y. Supp. 488.    There the record was bad, and the return clearly showed that it was considered upon the question of guilt.    That was a close case upon the evidence; so close that we were of opinion that the record must have turned the scale against the accused.    Here it is quite evident that the record played no such part.    It could have had nothing whatever to do with the just conclusion arrived at.    The only part it could have played, even if considered upon ·the question of guilt, was to induce the respondents to hesitate before convicting an officer whose long service in various grades was tinged with so little· that was discreditable.

The proceedings should be affirmed, with costs.    All concur.